UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

BRYAN DEJUAN LUSCO                                                    Plaintiff

v.                                          Civil Action No. 3:17-CV-00620-RGJ-RSE

DAE INDUSTRIES                                                       Defendant

* * * * *

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant DAE Industries' Motions to Dismiss,
[DE 40], and for Summary Judgment, [DE 46]. Plaintiff Bryan Dejuan Lusco ("Lusco") responded
to the Motions [DE 44, 48], and Defendant submitted replies [DE 45, 49]. These matters are ripe.
For the reasons below, the Court **GRANTS** Defendant's Motion for Summary Judgment [DE 46]
and **DENIES AS MOOT** Defendant's Motion to Dismiss [DE 40].

## I.      FACTUAL AND PROCEDURAL BACKGROUND

DAE Industries ("DAE") employed Lusco, an African American. Lusco alleges that DAE
"terminated" his job "for reporting the harassment, and threats of [his] white Supervisor Steven
Tuttle to the company." [Complaint, DE 1 at 5].

In his deposition, Lusco stated that he worked as an assembler. [Depo. of Bryan Dejuan
Lusco, dated Aug. 28, 2018, DE 46-2 at 484]. However, as part of his job, Lusco would sometimes
go on "road trips" for DAE, where he would report to Steve Tuttle, a Caucasian Crew Supervisor.
[*Id.*]. In May 2017, Lusco and Tuttle drove from Louisville, Kentucky to Lake Charles, Louisiana
on DAE business with Daquez Duncan and Jermaine Boyd, two other assemblers who are both
African American. [*Id.* at 486]. They drove to Lake Charles in a DAE-owned vehicle and stayed

1

in a hotel near the work-site. [*Id*. at 486–87]. Jason Bruce, the Project Manager for the Lake Charles project, traveled to Lake Charles separately and stayed in a different, nearby hotel. [*Id.*].

While in Lake Charles, Lusco, Duncan, and Boyd went to dinner. [*Id*. at 486]. After dinner Duncan recorded a video later posted on Facebook (the "Facebook Video"). [*Id*. at 486; DE 46 at 458; Ex. G]. In that video, Duncan says, "I'm f***ed up," calls Boyd "lit," says that one of the parties has "had one too many cold ones," and suggests that the group is "just riding around getting high and f***ed up." [DE 46 at 459]. Boyd also states that "[Lusco] been shootin up, so he got his long sleeves on." [*Id*. at 458].

Later in the video, Duncan gets into the front seat of the DAE-owned vehicle, turns the ignition, and states that he "need[s] to stop drinking." [DE 46 at 459]. Lusco asserts, however, that Duncan never operated the vehicle, and that Lusco was the sole driver of the DAE vehicle that evening. [DE 46-2 at 487–88]. Lusco further asserts that "everybody knows I take 21 pills a day and that I am the designated driver and I don't drink." [*Id*. at 490]. The next day, Lusco, Boyd, and Duncan told others at the work-site, including Bruce, about "how hard they had partied on Friday night [and] about various bars they visited, various drinks they shared and the fun they had at strip clubs." [Decl. of Jason Bruce, dated Aug. 30, 2018, DE 46-1 at 471].

A few days later, there was a slight drizzle, and after Tuttle described to Lusco, Boyd, and Duncan the work what needed to be done, they said, "N[o] we have told you since we got here that we are not going to work in the rain." [Decl. of Steve Tuttle, dated Aug. 31, 2018, DE 46-3 at 501]. Tuttle did not want to "listen to the mouth" while he was onsite, so he drove Lusco, Boyd, and Duncan back to the hotel and then returned to the work-site. [*Id.*] Tuttle and Bruce remained onsite and worked until about 6:30 p.m. [*Id.*].

On that same day, David Brodfehrer, Operations Director at DAE, learned about and reviewed the Facebook Video. [Decl. of David Brodfehrer, dated Sept. 27, 2018, DE 46-4 at 504–05]. After reviewing the video, Bodfehrer "advised [Tuttle and Bruce] that under no circumstances were Mr. Lusco, Mr. Duncan or Mr. Boyd to access or operate the DAE truck." [*Id.* at 505]. Tuttle returned to the hotel and informed Lusco, Boyd, and Duncan that they were not permitted to operate the DAE vehicle. [DE 46-3 at 498–99]. According to Tuttle, Lusco, Boyd, and Duncan "got upset and angry when I told them they could not use the Company vehicle," and Tuttle "felt threatened by Mr. Lusco who was the most boisterous out of the three individuals." [*Id.*].

During the incident Tuttle called Bruce and "placed [him] on speaker phone," from which Bruce could "hear screaming and cursing" and could tell that Lusco, Boyd, and Duncan "were loud, angry and defiant." [DE 46-1 at 472]. Bruce claims that he heard Lusco say "Jason you get your bitch-ass down here, you need to drive over to this hotel right now so I can show you how I roll. I roll hard. You better bring Lake Charles' finest with you because I roll hard. I ain't no bitch like you." [*Id.*]. Lusco disputes that he made this statement.[1] [DE 46-2 at 493].

Lusco admits that he was "yelling" at Tuttle but credits his outbursts to legitimate grievances against Tuttle. [*Id.* at 491–92]. Specifically, Tuttle informed Lusco that he would be "back around 10:00 to pick" them up, but Tuttle did not "come back till 6:30 that evening." [*Id.* at 494]. Lusco is diabetic and by the time Tuttle returned, Lusco "was worrying about . . . trying to get . . . something to eat because [he] was weak and [his] blood sugar had dropped so low from not having anything to eat." [*Id.*]. According to Tuttle's Incident Report, he told Lusco "I will get you something to eat but I can't give you the keys," but this offer led to the "yelling start[ing] again." [DE 46-3 at 502].

---

[1] When asked during his deposition why Bruce would fabricate this statement, Lusco replied "Because I called him a bitch and he is a bitch." [DE 46-2 at 493].

According to Tuttle, after the confrontation in the hotel room, Lusco, Duncan, and Boyd "got into the DAE truck and refused to leave the truck." [*Id.* at 499]. They were "told transportation would be arranged for them to return to Louisville, Kentucky by Greyhound bus [, but] refused to accept transportation by bus and refused to leave the truck." [*Id.*]. Lusco "threaten[ed] to beat [Tuttle] up right there in the parking lot [and] raised his fist a couple of times then tried to knock [his] phone out of [his] hand." [*Id*. at 502]. DAE paid for Lusco, Duncan, and Boyd to fly back to Kentucky the next day. [Pl. Resp. to Def.'s Request for Admission, DE 46-5 at 520].

Brodfehrer asserts that Tuttle and Bruce informed him that "Lusco, in particular, was aggressive and making threatening comments" and that Lusco "was the one acting 'all aggressive.'" [DE 46-4 at 506 (quoting a text message from Tuttle to Brodfehrer)]. According to Brodfehrer, "Jason Bruce had arranged to have Steve Tuttle get a room in a separate hotel based on concerns for his safety in relation to Lusco, Duncan and Boyd." [*Id.* at 507]. Brodfehrer asserts that he "made the decision to suspend Lusco, Duncan and Boyd on that Tuesday afternoon, May 23, 2017," based on "the circumstances that were reported to [him] on May 22, 2017, and [his] personal review of the video." [*Id.*]. On Wednesday, May 24, Brodfehrer "made the decision to terminate the employment of Bryan Lusco, Daquez Duncan and Jermaine Boyd [because of] their insubordination and unprofessional conduct on Monday evening, May 22, 2017." [*Id.* at 507–08].

Lusco filed this Complaint *pro se*, alleging that DAE terminated his employment and retaliated against him because of his sex and race in violation of Title VII of the Civil Rights Act of 1964. [DE 1 at 4–6].

## II.    STANDARD

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of specifying the basis for its motion and showing the lack of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the nonmoving party must produce specific facts demonstrating a material issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "Factual differences are not considered material unless the differences are such that a reasonable jury could find for the party contesting the summary judgment motion." *Bell v. City of E. Cleveland*, 125 F.3d 855 (6th Cir. 1997) (citing *Liberty Lobby*, 477 U.S. at 252).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *See Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008); *see also Adams v. Metiva*, 31 F.3d 375, 385 (6th Cir. 1994). The Court must view the evidence and draw all reasonable inferences in a light most favorable to the nonmoving party. *See Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000). But the nonmoving party must do more than show some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party must present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1); *see also Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 136 (6th Cir. 2014). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Liberty Lobby*, 477 U.S. at 252.

"Conclusory allegations in [a] complaint cannot serve to oppose a motion for summary judgment." *Whittley v. Wal-Mart Stores East, LP.*, No. 4:15CV-00019-HBB, 2015 WL 5554044, at *3 (W.D. Ky. Sept. 21, 2015) (citing *Kendall v. The Hoover Co.*, 751 F.2d 171, 173 (6th Cir. 1984)). Rule 56(c)(1) requires that a "party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). A complaint may "carr[y] the same weight as would an affidavit for the purposes of summary judgment," but only if the complaint is "signed . . . under penalty of perjury." *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008).

## III.    DISCUSSION

### A.    Motion for Summary Judgment

Lusco claims discriminatory termination and retaliation based on his sex and race. [DE 1 at 5]. DAE moves for summary judgment on all claims. [DE 46 at 457]. Lusco responded, [DE 48], and DAE replied, [DE 49].

#### 1.    *Discriminatory Termination*

Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, (1993). In a claim for disparate treatment based on one's race or sex, "the plaintiff must establish that the adverse employment action was motivated, in part, by the plaintiff's protected-group status." *Lewis-Smith v. Western Ky. Univ.*, 85 F.Supp.3d 885, 897 (W.D. Ky. 2015). Without a

discriminatory basis, an employer's discharge decision does not violate Title VII. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 514 (1993) ("We have no authority to impose liability upon an employer for alleged discriminatory employment practices unless an appropriate factfinder determines, according to proper procedures, *that the employer has unlawfully discriminated*.") (emphasis in original).

A plaintiff must present either direct or indirect evidence of racial discrimination. *Paasewe v. Ohio Arts Council*, 74 F. App'x 505, 507 (6th Cir. 2003). When, as here, a plaintiff seeks to prove discrimination through indirect evidence [*see* DE 48 at 539], courts apply the three-step *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).

At the first step of the *McDonnell Douglas* framework, the plaintiff must present evidence sufficient to establish a *prima facie* case of discrimination. *Id.* at 802. "To establish a *prima facie* case of employment discrimination, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) (citing *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008)).

Once a plaintiff meets his *prima facie* burden, the burden of production shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action. *McDonnell Douglas Corp.*, 411 U.S. at 803. If the defendant articulates such a reason, the burden then shifts back to the plaintiff to show by a preponderance of the evidence that the proffered reason is pretext for unlawful discrimination—that is, "that the [employer's proffered] reason was false, *and* that discrimination was the real reason." *Hicks*, 509 U.S. at 515. (emphasis in original).

DAE does not contest that Lusco meets the first three requirements of a *prima facie* discrimination claim—Lusco is a member of a protected class, DAE terminated his employment, and he was qualified for the position from which he was terminated.  [DE 46 at 463–64].  DAE argues, however, that Lusco has not met his burden on the fourth element because he "was not treated differently than any similarly situated non-minority or female employee."  [*Id*. at 466].

To satisfy his burden on the fourth element, Lusco "must show that the 'comparables' are similarly-situated *in all respects*."  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (emphasis in original) (citing *Stotts v. Memphis Fire Dep't*, 858 F.2d 289 (6th Cir. 1988)).  He must show that "his proposed comparators were similar in all *relevant respects* . . . and that he and his proposed comparators engaged in acts of comparable seriousness."  *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012) (emphasis added) (citing *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006)).  The Court looks to factors, including whether the "similarly-situated,' [ ] individuals . . . have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Mitchell*, 964 F.2d at 583 (citations removed).  But these factors do "not automatically apply in every employment discrimination case" or operate as "inflexible requirement[s]."  *Bobo*, 665 F.3d at 751 (citing *McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005); *Seay v. Tennessee Valley Auth.*, 339 F.3d 454, 479–80 (6th Cir. 2003).  Rather, the Court must make "an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee.'"  *Escalera v. Bard Med.*, No. 4:16CV-00121-JHM, 2019 WL

1207948, at *7 (W.D. Ky. Mar. 14, 2019) (quoting *Guyton v. Exact Software of N. Am.*, No. 2:14-CV-502, 2016 WL 3927349, at *10 (S.D. Ohio July 21, 2016)).

Lusco made no arguments and produced no evidence regarding non-male individuals, and he therefore fails to make a *prima facie* showing of sex discrimination.[2]  As for race discrimination, Lusco argues that Tuttle, a Caucasian, and Lusco were similar in their employment status because both were "member[s] of the crew team," both "had to perform the same duties as the rest of assembler crew [sic]," and "in this particular job at Lake Charles Louisiana, [Tuttle's] tasks were no different from Mr. Lusco's."  [DE 48 at 540].  And Lusco argues that their alleged behavior was similar because "[a]n argument among Mr. Tuttle, Mr. Lusco, Mr. Duncan, and Mr. Boyd began . . . and Mr. Tuttle threated [sic] physical violence to the other crew members, and threated [sic] to leave them behind in Kentucky."  [*Id.*].

While there is perhaps an issue of material fact about whether Lusco and Tuttle are similarly situated in their employment position [*compare* DE 48 at 540 *with* DE 49 at 548–49], Lusco has not met his burden that their alleged behavior was similar.  First, unlike Lusco, Tuttle did not appear in a posted Facebook video, in which a DAE employee, in the driver's seat of a DAE vehicle with the ignition on, says "I'm f***ed up," and suggests that the group is "just riding around getting high and f***ed up."  [DE 46 at 458–59].  Nor was Tuttle described in that video as "shootin up," an apparent reference to intravenous heroin use.  [*Id.* at 458].

Lusco tries to minimize the severity of this behavior, pointing out that "no drinking, or drug use was depicted in the video" and asserting that "it is fairly obvious that most of the commentary in the video is comedic banter."  [DE 48 at 541].  Whether or not Lusco considers the

---

[2] Indeed, by failing to address this point in his Response, Lusco has abandoned his sex-discrimination claim. *See Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.").

Facebook video a serious matter, DAE did. Brodfehrer immediately instructed that Lusco, Duncan, and Boyd were prohibited from operating the DAE vehicle. [DE 46-4 at 505]. And it is uncontested that it was in part because of Lusco's appearance in the video that Brodfehrer suspended him. [DE 46-4 at 507; DE 48 at 541].

Second, Lusco admits that he was "yelling" at Tuttle, [DE 46-2 at 492]. While Lusco denies trying to harm Tuttle, [DE 46-2 at 492], he does not deny that he "was aggressive and making threatening comments" towards Tuttle, [46-4 at 506]. Lusco admits refusing to travel back to Louisville by bus, which required DAE to pay for airfare back to Louisville. [*Id.*].

In his Response, Lusco asserts that "Tuttle threatened [sic] physical violence to the other crew members, and threatened [sic] to leave them behind in Kentucky." [DE 48 at 540]. Lusco provides no record citations in support of these conclusory allegations, instead only citing his unverified complaint. [*See generally*, DE 48 citing "Plaintiff's Complaint"]. A review of the record finds no support for these assertions. Tuttle, Bruce, and Brodfehrer all provide sworn statements in which they recount their understanding of events, and none of the three suggest that Tuttle was confrontational. [*See* DE 46-1; 46-3; 46-4]. In his Incident Report, Tuttle recounted that he "had tried the whole time to calm the situation till I was threatened," at which point he "[left] the situation and [went] to [his] room." [DE 46-3 at 502]. And while Tuttle admits that after he was threatened, he "told [Lusco] to get to walking I ain't driving anybody home after being physically threatened," [*id.*], Lusco admitted in his deposition that he was "informed that [he] would be transported back to Kentucky by bus." [DE 46-2 at 492]. Even though the record contains uncontested evidence that Lusco acted insubordinately, disruptively, and violently, the record contains no evidence that Tuttle acted in any of those ways. These differences are the precise sort that are relevant when evaluating a purported *prima facie* claim of discrimination. *See Laughlin*

*v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260 (4th Cir. 1998) ("Title VII was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work.") (internal citations omitted).

And even if Lusco and Tuttle had engaged in equivalent misconduct, Lusco still fails to establish that he was "*treated differently* than similarly situated non-protected employees." *White*, 533 F.3d at 391 (emphasis added). Lusco does not allege that DAE failed to punish Tuttle after the Lake Charles trip and the record is silent in this regard. Without showing that Tuttle was treated differently—that is, that Tuttle was not also disciplined—Lusco cannot establish a *prima facie* case of unlawful discrimination.

b.  <u>DAE articulated a legitimate nondiscriminatory reason for the adverse employment action</u>

Lusco does not contest that DAE has articulated a legitimate nondiscriminatory reason for the adverse employment action. [DE 48 at 541].

c.  <u>Lusco failed to show that the proffered reason was pretextual</u>

Even if Lusco established a *prima facie* case of discrimination, he fails to establish that DAE's legitimate nondiscriminatory reasons for the termination of his employment—the Facebook Video and his later behavior—were pretextual. To establish that an articulated nondiscriminatory reason was pretextual, a plaintiff must "establish that it (1) 'had no basis in fact,' (2) 'did not actually motivate' his firing, or (3) 'was insufficient to explain' his firing." *Fields v. Health*, No. 3:16-cv-100-DJH-CHL, 2017 WL 3910226, at *5 (W.D. Ky. Sept. 6, 2017) (quoting *Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 569 (6th Cir. 2009)).

Lusco relies solely on the second method, arguing that he "can establish pretext by showing that the Defendants' [sic] alleged reason for his termination did not actually motivate his termination." [DE 48 at 541]. In his sworn declaration, however, Brodfehrer, the individual who

"made the decision to terminate the employment of Bryan Lusco," states that he did so because of Lusco's "insubordination and unprofessional conduct." [DE 46-4 at 507–08]. Lusco has presented insufficient evidence to dispute Brodfehrer's assertion.

Lusco's argument that the articulated reasons for his termination were "insufficient to explain" the termination is not enough to establish a pretext. [DE 48 at 541; *Fields*, 2017 WL 3910226, at *5]. "A showing of insufficiency may overlap with the 'similarly situated' prong of the *prima facie* case; pretext may be established by 'evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff.'" *Id.* (quoting *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 676 (6th Cir. 2008)). As discussed above, Lusco has not shown that he and Tuttle engaged in substantially identical conduct.

Because Lusco has failed to establish a *prima facie* case of discrimination and failed to establish that DAE's articulated legitimate nondiscriminatory reasons for terminating Lusco's employment were pretextual, the Court **GRANTS** DAE's Motion for Summary Judgment as to the allegations of unlawfully discriminatory termination.

2.    *Retaliation*

Title VII also forbids

> an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a); *Morris v. Oldham Cty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000). The process for bringing a claim for discriminatory retaliation mirrors that for bringing one for

discriminatory termination—absent direct evidence of discrimination, courts must apply the *McDonnell Douglas* burden-shifting framework. *See Morris*, 201 F.3d at 792–93. The elements of a *prima facie* case of Title VII retaliation are different, however; establishing a *prima facie* case of retaliation requires that:

> A plaintiff must . . . prove that: (1) []he engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Id.* at 792.

Lusco does not assert that he engaged in any activity protected by Title VII or that his termination was caused by his engagement in any activity protected by Title VII.[3] Lusco included no arguments about DAE's retaliation and there is no evidence in the record that Lusco ever communicated to Brodfehrer any concerns with Tuttle's behavior. As discussed above, the only record of communications between Lusco and Brodfehrer does not mention Tuttle. [*See* DE 46-4 at 511, 515]. Lusco has therefore failed to establish a *prima facie* case of Title VII retaliation, and the Court **GRANTS** DAE's Motion for Summary Judgment as to the allegations of unlawful retaliation.

## B.    Motion to Dismiss

Lusco moved for leave to proceed *In Forma Pauperis* [DE 3], which the Court granted [DE 4]. Lusco later secured representation. DAE has also moved to dismiss, asserting that Lusco had intentionally misled the Court in his Motion for Leave to Proceed *In Forma Pauperis*. [DE 40 at

---

[3] In his Response, Lusco discusses the standard for establishing a *prime facie* case of unlawfully discriminatory termination only, not unlawful retaliation. [DE 48 at 539].

351].  Lusco responded, [DE 44], and DAE replied, [DE 45].  Because the Court is granting DAE's

Motion for Summary Judgment, it **DENIES** that motion as **MOOT**.

### IV.    CONCLUSION

Accordingly, for the stated reasons, and being otherwise sufficiently advised, **THE**

**COURT ORDERS** that Defendant DAE Industries' Motion for Summary Judgment, [DE 46], is

**GRANTED** and Defendant's Motion to Dismiss, [DE 40] is **DENIED AS MOOT**.

This is a final and appealable order.  There being no just cause for delay, the Court will

enter a separate judgment.

Rebecca Grady Jennings, District Judge
United States District Court

September 16, 2019